UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND (GREENBELT)

---

NEIL F. LETREN, et. al.

                                                    CASE NO.  8:15-cv-03361-PX

      Plaintiff,

vs.

TRANS UNION, LLC, et. al.

      Defendants.

---

**PLAINTIFF'S OPPOSITION TO TRANS UNION'S
MOTION FOR SANCTION**

     The Plaintiff, Neil F. Letren ("Letren"), by undersigned counsel, opposes Defendant Trans Union, LLC's Motion for Sanction, and in support thereof states the following:

**ARGUMENT**

**I.    Plaintiff Had A Good Faith Basis For All Of His Claims Against TransUnion.**

    A.    Plaintiff had a Good Faith Basis for Asserting
           that TransUnion's Report was Inaccurate

    1.    In June 2007 Plaintiff purchased the property located at 10 R Street, Northeast, Washington, District of Columbia ("Property"). He obtained a loan in the amount of $895,000.00 from American Home Mortgage Acceptance ("AHMA") to finance the purchase of the Property. He signed a promissory note ("Note") payable to AHMA in exchange for the loan. He signed a deed of trust ("DOT") that secured the Note by making the Property collateral for the loan in the event he defaulted on the loan.

1

In September 2008 MERS initiated the foreclosure process on the Property. Plaintiff received notice that the substitute trustee purchased the Property at the foreclosure sale on behalf of MERS and/or Wells Fargo Bank, N.A. In May 2009 the foreclosure process was completed with Wells Fargo Bank, N.A. obtaining title and ownership of the Property. Plaintiff received notice that he was liable for a deficiency on the Note as a result of the foreclosure sale.

JPMorgan Chase Bank, N.A. ("JPMC") was *not* a party to the Note or DOT. Plaintiff never received any notice from JPMC, or any other entity, stating that JPMC was acquiring either the ownership or servicing of the loan. He never had any communication with JPMC regarding the Property. He never made any payments to JPMC regarding the loan on the Property, nor had any liability or obligation to JPMC regarding making any payments for the Property.

On December 1, 2009, Plaintiff filed a chapter 7 bankruptcy petition. He included the loan deficiency for the Property in the bankruptcy filing by listing the Property and referencing the deficiency in the Schedule F of the bankruptcy petition. See Generally Ex. P of Joint Record.

In August 2013, Plaintiff sought to refinance his personal residence and obtained his personal credit reports, including his TransUnion credit report. Only his TransUnion report indicated that JPMC was reporting a mortgage loan. The Trans Union report also indicated that "Pay Status: Account included in Bankruptcy." See Ex. K of the Joint Record, JR-000228

In March 2010, after receiving notice of Plaintiff's bankruptcy, TransUnion labeled the JPMC account as included in his bankruptcy. TransUnion continued to report that the JPMC account was included in his bankruptcy for over three years. In September 2013, Plaintiff for the first time, contacted TransUnion regarding the JPMC account. He filed a dispute with Trans Union asserting that JPMC was *not* a holder of his mortgage note. In October 2013, Plaintiff

received Trans Union's investigation results which reported the JPMC account as "Foreclosure Collateral Sold, 120 Days late and $4,222 monthly obligation." After two years of disputing TransUnion's designation of the JPMC account, and TransUnion changing the designation of the JPMC account from "Foreclosure Collateral Sold, 120 Days late and $4,222 monthly obligation" to "Account included in Bankruptcy," and back again, Plaintiff filed a complaint against TransUnion. See Ex. O of the Joint Record, pp 8-16, JR-000302 – JR-000303.

In his complaint, Plaintiff alleged that TransUnion violated the Fair Credit Reporting Act (FCRA) because, among other things, TransUnion failed to designate the JPMC account as included in his bankruptcy. Plaintiff is aware that he did not include the JPMC account in his bankruptcy petition, but he has a good faith basis to believe that the JPMC account and the AHMA account are the same account. In September 2013, Plaintiff mailed a disputed to TransUnion asserting that JPMC was not the legal holder of mortgage note. See JSUF 8. Because TransUnion continually reported that JPMC was the holder of his mortgage note, and TransUnion never reported his AHMA account; Plaintiff believed that that his AHMA account was subsequently acquired by JPMC, or JPMC is the servicer of his AHMA account. If either is true, then the JPMC account should be designated as included in his bankruptcy.

As stated above, in August 2013, Plaintiff acquired all three of his credit reports. Only the TransUnion report listed the JPMC account and failed to list the AHMA account. The JPMC account indicated the same loan amount as Plaintiff's AHMA account. Additionally, the TransUnion report indicated the JPMC account was included in Plaintiff's bankruptcy and it did so for over three years. Accordingly, Plaintiff had a good faith basis for asserting that the JPMC account was included in his bankruptcy. Plaintiff believed that since the TransUnion report did not indicate such, that said report was inaccurate.

2.     On March 20, 2017, *Letren v. JP Morgan Chase Bank, N.A.,* 8:16-cv-03520-PX, a separate but related case, was dismissed with prejudice after the parties signed a confidential settlement agreement (CSA). Neil Letren, the pro se plaintiff in that case is also the plaintiff in this case. Plaintiff's counsel has reason to believe that the contents of the CSA will provide evidence that Plaintiff obtained a loan in the amount of $895,000.00 from AHMA to finance the purchase of the property located at 10 R Street, Northeast, Washington, DC, and that JPMC was a previous servicer of that loan and not the holder of the loan. This evidence would establish that TransUnion should have reported the JPMC account as AHMA account or at the very least designate the JPMC account as included in Plaintiff's bankruptcy. Accordingly, this evidence would establish that the TransUnion report was not accurate.

Under the terms of the CSA, Plaintiff must be served with a subpoena to disclose the contents of the CSA. Since this case is designated as "Closed," Plaintiff's counsel could not serve Plaintiff with a subpoena with respect to this case. Plaintiff's counsel believes that this is probative evidence that this court should consider with respect to TransUnion's motion. For this reason, Plaintiff's counsel will file a Pre-motion letter seeking permission to file a motion to re-open this case and thereby allowing Plaintiff's counsel to subpoena the CSA.

B.     Plaintiff had a Good Faith Basis for Asserting that
       <u>TransUnion's Inaccurate Report Caused Damages</u>

As stated above, starting in August 2013, Plaintiff wished to refinance his home and applied for credit from many different sources. All of his applications for credit were denied. Plaintiff did not retain or could not locate all of the credit denial letters that he received. <u>See Ex. H of the Joint Record JR-000138 – 142</u>. Plaintiff explained that he did not diligently maintain

4

these records because at the time he was not planning to initiate litigation and was only interested in rebuilding his credit. Id., JR-000176.

However, Plaintiff did see and read all of the denial letters that he did not retain or could not locate. According to his sworn response to TransUnion's interrogatory 5, those denial letters indicated that TransUnion provided credit reports to those creditors. Plaintiff further asserted that the creditors' decisions to deny him credit were partly based on the inaccurate information contained in the TransUnion credit report.

## II. TransUnion's Attorneys are Attempting to Distract this Court by Asserting Irrelevant Arguments

TransUnion's Attorneys use a significant portion of their motion arguing that this Court should sanction Plaintiff because of his association with Thomas Alston and should sanction Plaintiff's counsel because of a eight-year old ethic violation. I will briefly address both issues to clarify the record.

A. TransUnion's Attorneys are urging this Court to sanction Plaintiff using the illegitimate legal standard of "Guilt-by-Association." Notwithstanding the fact that this standard is not permitted by any statute or court rule, TransUnion's Attorneys have failed to indicate how Mr. Alston is associated with this case. TransUnion Attorney Katherine Robinson, spent a great deal of time during Plaintiff's deposition inquiring about Mr. Alston to the point it seemed obsessive. Ms. Robinson seemed frustrated that she could not elicit evidence from Plaintiff that directly tied Mr. Alston to Plaintiff's complaint.

B.  It is true that Plaintiff's counsel was admonished by the DC Board of Elections (DCBOE) in 2009. However, to get a complete understanding of why and how this occurred, I must provide a brief history of events.  In 2006, I decided to become more active in my community and decided to run for a seat on the Advisory Neighborhood Commission. I ran against an 18-year incumbent and defeated him.  After being installed as an Advisory Neighborhood Commissioner (ANC), I started publishing a color, magazine-type community newsletter and distributed it throughout my district.  Since the city did not provide funds for such communication, I was using my own expenditures to publish and distribute the newsletter.

Soon I was unable to continue to finance the publishing and distribution of the newsletter. My publishing partner suggested we sell advertisement to cover the cost of the newsletter. Because I did not want the advertising revenue to co-mingle with my personal funds, I set up an LLC for the sole purpose of opening a bank account to deposit the ad revenues and to use that account to pay for the publishing and distribution of the newsletter.

In 2008, a close ally of my former political opponent filed an ethic complaint against me, asserting that I was attempting to earn a profit using my office.  My former opponent challenged me for re-election in 2008 and used the ethic complaint as a political weapon in hopes of defeating me.  Fortunately, my constituents saw through this political trick and re-elected me with a larger margin than I received in 2006. I was re-elected again in 2010, 2012, and 2014. I decided to retire after serving my fifth term as an ANC.  I am very proud of my ten-year tenure as an elected official.

By the time the DC Board of Elections heard my case in 2009, I had already stop publishing the newsletter because the ad revenues never came close to covering the cost of the newsletter.  The DCBOE determined that the use of my name and title on ad solicitation letters

was a violation of DC election laws. Accordingly, DCBOE admonished me and fined me $2000.00. However, DCBOE suspended the fine because they determined the violation was not willful and a profit was never realized. The fact that TransUnion's Attorneys would use this eight-year old violation to impugn my character and integrity, smacks of desperation.

### III. TransUnion's Attorneys Have Repeatedly and Intentionally Made False Statements to this Court

Surely if TransUnion's Attorneys believe that this Court should consider who Plaintiff associates with and Plaintiff's counsel's eight-year old election law violation, then they must also believe that this Court should consider their lack of veracity when determining whether to grant TransUnion's motion for sanction.

A. On page 9-10 of TransUnion's Memorandum in Support of it Motion for Summary Judgment, ECF-67, states "Despite repeatedly asking Plaintiff's counsel to remedy this omission, he never served signed Responses (Request for Admissions)." This refers to Ms. Robinson's Declaration, Ex. C, JR-000050 at #8, which states "TransUnion informed Plaintiff's counsel that the Responses (Request for Admissions) were unsigned on April 6, 2016, April 20, 2016 and April 28, 2016." Although Ms. Robinson affirmed that this statement was true under penalty of perjury, this statement is completely false.

When I was assisting Plaintiff in responding to TransUnion's discovery requests, Plaintiff was out of the country. Plaintiff emailed me signed copies of his responses in pdf files. My intention was to print the documents, sign them, scan them, and forward them by email to Ms. Robinson. However, my scanner was malfunctioning and I was unable to scan the documents which were signed by both Plaintiff and myself. Accordingly, I forwarded the pdf files I

7

received from Plaintiff which contained only his signature, with the intention of forwarding my signature pages at a later date. On April 20, 2016, I received an email[1] from Ms. Robinson See Ex. A, which stated in part, "I would also note that we have yet to receive discovery responses with your signature. The responses are therefore all deficient under the Federal Rules. Please remedy this oversight immediately." As Ms. Robinson stated, this was nothing more than an oversight. After receiving her email, I sent Ms. Robinson the missing signature pages. On April 28, 2016, Ms. Robinson and I had a telephone conference to discuss discovery disputes. At the end of the discussion, Ms. Robinson told me that she had received some but not all of my signature pages. It was my belief that I sent all of the missing signature pages. I asked her which signature pages are missing. She informed me that she was not sure which signature pages were missing, and she would email me later to advise me. Later that same day, I received an email from Ms. Robinson wherein she stated, "As an initial matter and as you agreed, please return Interrogatory Responses with your signature as soon as possible." See Ex. B.

Contrary to her signed declaration, on April 28, 2016, Ms. Robinson never informed me that she was missing my signature page for the Requests for Admissions, nor did she request me to send it to her. She only indicated that she was missing my signature page with respect to the Interrogatory Responses.

B.     On page 2 of TransUnion's February 13, 2017, Pre-Motion letter, ECF – 83, it States, "On July 12, 2016, Plaintiff required TransUnion to travel from Indianapolis for a settlement conference at which Plaintiff changed his first failed theory and bad faith argument and made a new impromptu bad faith claim: now, that he never HAD the Account." This statement is also absolutely false.

---

[1] I cannot find an April 6, 2016, email from Ms. Robinson discussing missing signature pages.

Plaintiff's argument regarding the JPMC account was not first discussed at the July 12, 2016 settlement conference, nor was it impromptu. Plaintiff's counsel discussed with Ms. Robinson on more than one occasion before the close of the discovery period, Plaintiff's theory regarding the JPMC account. Although Ms. Robinson may deny this, she cannot deny that Plaintiff testified during his deposition regarding his theory with respect to the JPMC account.

Additionally, it is absolutely false that Plaintiff required TransUnion to travel from Indianapolis for the July 12, 2016, settlement conference. Ms. Robinson advised me that TransUnion was planning to file a motion requesting that the TransUnion representative be allowed to attend the July 12, 2016, settlement conference by telephone. Ms. Robinson asked Plaintiff's counsel to consent to their motion, which we did. See Ex. C. Accordingly, the TransUnion representative attended the July 12, 2016, settlement conference by telephone, and did not appear in person.

Moreover, the July 12, 2016, settlement conference only occurred because TransUnion wanted it to occur. More time than I can count, Ms. Robinson advised Plaintiff's counsel that TransUnion thought Plaintiff's claims were frivolous and would never offer a settlement to Plaintiff. Knowing that a settlement conference would be fruitless, Plaintiff's counsel called Ms. Robinson and advised her that going forward with the July 12, 2016 settlement conference would be a waste of time and money for both Plaintiff and TransUnion, and additionally it would be a waste of court resources. Plaintiff's counsel implored Ms. Robinson to join with Plaintiff and request a cancellation of the settlement conference. Ms. Robinson advised me she would contact her client and contact me later. On July 11, 2016, Ms. Robinson sent me an email stating, "We have discussed your request to cancel tomorrow's Settlement Conference with Trans Union. Trans Union would like to move forward with the Conference as scheduled." See Ex. D.

Thus, Plaintiff did not force TransUnion to attend the settlement conference; in actuality, TransUnion forced Plaintiff to attend. Additionally, TransUnion's Attorneys claim they spent 28.75 hours to prepare for and attend the July 12, 2016, settlement conference. We assert it is unlikely that 28.75 hours was needed to prepare for a settlement conference wherein nothing of substance occurred and the conference was over in less than an hour.

**CONCLUSION**

For the foregoing reasons the Plaintiff respectfully requests that Trans Union's motion for sanction be denied.

Respectfully submitted,
CHAPPLE LAW FIRM

_____
Kevin L. Chapple, Esq., Bar #19361
438 S Street Northwest
Washington, DC 20001
Tel: (202) 669-4014
E-mail:kevinlchapple@aol.com

*Counsel for Plaintiff*